UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LOIS LANE, a pseudonym, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 1:22-cv-00092-WES-LDA |
| | : | |
| BROWN UNIVERSITY and | : | |
| JANE ROE, a pseudonym, | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, Lois Lane[1] ("Plaintiff"), respectfully submits this Memorandum of Law in support of their[2] Motion for Temporary Restraining Order and Preliminary Injunction against Defendant, Brown University ("Brown").  This motion is supported by Plaintiff's Verified Complaint.

## SUMMARY OF ARGUMENT

This action asserts claims against Brown for breach of contract, breach of the implied covenant of good faith and fair dealing, and deliberate indifference to a hostile education environment in violation of Title IX of the Educational Amendments Act of 1972 ("Title IX"). The instant motion focuses on the breach of contract claims.  Brown has breached its contract with Plaintiff by (i) unduly delaying the investigation and adjudication of a Title IX complaint made against Plaintiff by Defendant Jane Roe, which has denied Plaintiff the right to a fair and prompt investigation and hearing process, and (ii) arbitrarily and capriciously insisting on

---

[1] Plaintiff has filed herewith a motion for leave to litigate this action under the pseudonym Lois Lane.  Plaintiff has also maintained the confidentiality of Jane Roe's true identity and will leave it for this Court to decide whether Jane Roe should remain anonymous.

[2] Plaintiff is a transgender female and identifies as they/them/their.

adjudicating a sexual misconduct complaint brought against Plaintiff under a procedure that will deny them of certain rights and privileges they had a reasonable expectation of having in the event they became the subject of a student misconduct complaint.

The breach of contract claims are premised on the rights Brown affords students accused of sexual misconduct to a fair and prompt hearing process and to prepare and submit a written statement to the hearing panel in advance of the hearing.  These rights are contained in the procedure that was in effect when Plaintiff matriculated at Brown in the Fall of 2019 and when the misconduct is alleged to have occurred in February 2020.  However, Brown is insisting on following a more recently-adopted procedure that denies students accused of sexual misconduct the right to prepare and submit a written statement to the hearing panel in advance of the hearing. Brown's rationale is that it uses the *policy* in effect at the time of the alleged misconduct and the *procedure* in effect at the time the sexual misconduct complaint is filed.

This Court has held that under Rhode Island law a "'student's relationship to his university is based in contract.'"  *Doe v. Brown University*, 166 F. Supp. 3d 177, 191 (D.R.I. 2016) (quoting *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007)). "Accordingly, 'if the university explicitly promises an appeal process in disciplinary matters, that process must be carried out in line with the student's reasonable expectations.'"  *Id*.  With the investigation process going into its sixth month, Brown has already denied Plaintiff their contractual right to a fair and prompt investigation and hearing process.  Unless this Court intervenes, Brown will also deny Plaintiff their contractual right to submit a written statement to the hearing panel in advance of the hearing.  Accordingly, Plaintiff moves this Honorable Court to issue a temporary restraining order and mandatory injunction ordering Brown to cease its investigation and take no disciplinary action against Plaintiff in connection with the Title IX

complaint and/or the events alleged to have occurred due to Brown's undue delay for the past

five (5) months or, in the alternative, to (i) complete its investigation of the Title IX complaint

promptly and without further undue delay, (ii) schedule Plaintiff's student misconduct hearing

promptly upon completion of the investigation, (iii) follow the Title IX procedure for the student

misconduct hearing which affords Plaintiff the right to submit a written statement to the hearing

panel in advance of the hearing, and (iv) not discriminate or retaliate against Plaintiff based on

being a transgender person or for pursuing their rights in this action.  Plaintiff will be irreparably

harmed if the requested injunctive relief is not granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff matriculated as a student at Brown in the Fall of 2019.  At that time, Brown had

in effect the following Title IX policy and procedure:

1. ***Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy*** ("2019 Title IX Policy").

2. ***Complaint Process Pursuant to the University Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy*** ("2019 Title IX Procedure").

The 2019 Title IX Policy, attached as **Exhibit 1**, and the 2019 Title IX Procedure, attached as

**Exhibit 2**, were last updated in 2016 but were the versions in effect in 2019 when Plaintiff

matriculated.  The 2019 Title IX Procedure expressly provides in pertinent part:

> The parties may submit a written statement to be considered by the hearing panel. The written statement must be submitted twenty-four (24) hours before the scheduled hearing.

**Exhibit 2**, § VIII.A.8.  At the time of Plaintiff's matriculation, Brown promised Plaintiff that they

would have the right to submit a written statement to a hearing panel if they became the subject a

Title IX complaint.  **Exhibit 2**, § VIII.A.8.  The 2019 Title IX Procedure also states that Brown

"ordinarily will seek to complete its investigation and disciplinary process, if any, within sixty (60)

days. . . . The University's overarching goal is that all Complaints be investigated in a prompt, fair, and impartial manner." **Exhibit 2**, § X.

Brown also had in effect when Plaintiff matriculated ***Student Conduct Procedures 2019-2020*** ("2019 Non-Title IX Procedure"), attached as **Exhibit 3**.  The 2019 Non-Title IX Procedure provides the process to investigate and resolve alleged violations of the Code of Student Conduct.  The Code of Student Conduct defines prohibited student conduct involving non-sexual offenses such as cheating, drugs, theft, misrepresentation or alcohol.  Whereas, the 2019 Title IX Policy defines prohibited conduct involving relationship or dating violence, sexual assault or sexual harassment.  The 2019 Non-Title IX Procedure also provides its own procedure for adjudicating non-sexual offenses.  Specifically, it states under Student Rights and Responsibilities:

> **Respondent Rights.**  Students and student groups are afforded the following rights in Student Conduct proceedings:
> \*       \*       \*       \*       \*
> G.  . . . (Students have the right to prepare a written statement in matters that may result in separation from the University.)

**Exhibit 3**, § 4.

Plaintiff was provided copies of the 2019 Title IX Procedure and the 2019 Non-Title IX Procedure during a sexual assault prevention program during orientation and had to acknowledge receipt of the procedures.  Ver. Comp. ¶ 67.  Therefore, at the time of Plaintiff's matriculation at Brown, they had a reasonable expectation of the rights to which Brown promised to afford them, including the right to a fair and prompt investigation and hearing process and the right to submit a written statement to a hearing panel if they became the subject of a Title IX complaint or the

subject of any other student misconduct complaint so long as the discipline to be imposed could result in separation from Brown.[3]  Ver. Comp. ¶ 68.

The 2019 Title IX Procedure is the operative contract between Plaintiff and Brown as to how Title IX formal complaints made against Plaintiff, while a student at Brown, must be investigated, heard and decided, including the time frame within which all of it is completed. Plaintiff has not received any notice from Brown as to any proposed modification to those procedures or anything else from Brown that might alter Plaintiff's reasonable expectation of the rights to be afforded them in the event they became the subject of a Title IX complaint or other student misconduct complaint while a student at Brown. Ver. Comp. ¶ 70.

On February 15, 2020, Plaintiff and Jane Roe engaged in consensual sexual contact at Marcy House, a dormitory and fraternity house, on Brown's campus.  Ver. Comp. ¶ 10.  All sexual contact between Plaintiff and Jane Roe was consensual with express permission given by Jane Roe.  Ver. Comp. ¶ 11.  The February 15, 2020 encounter ended with Plaintiff and Jane Roe expressing an interest to meet again in the future.  Ver. Comp. ¶ 12.  Approximately one to two weeks after the February 15, 2020 encounter, Jane Roe initiated a kiss with Plaintiff.  Ver. Comp. ¶ 13.  Plaintiff and Jane Roe subsequently maintained non-sexual contact with each other. Ver. Comp. ¶ 14.  Plaintiff and Jane Roe spent casual time together, studied together, and discussed seeking common housing in a dormitory suite together for the following semester. Ver. Comp. ¶ 14.  At no time did Jane Roe indicate that she was uncomfortable being around or communicating with Plaintiff. Ver. Comp. ¶ 14.

In the Fall of 2020, Jane Roe filed an informal complaint with Brown's Title IX and Gender Equity Office ("Title IX Office") relating to the February 15, 2020 encounter ("Informal

---

[3]  There is no dispute that Plaintiff could be separated from Brown if they are found responsible for the allegations lodged against them.

Complaint"). Ver. Comp. ¶ 15. Throughout the Fall of 2020, Plaintiff and Jane Roe lived in separate dormitory suites near each other in the same building. Ver. Comp. ¶ 15. Plaintiff was not informed of the Informal Complaint until January 31, 2021. Ver. Comp. ¶ 15. According to correspondence from the Title IX Office to Plaintiff, the Informal Complaint alleged conduct that would constitute prohibited conduct, but that Jane Roe did not want Brown to take any action against Plaintiff with respect to same. Ver. Comp. ¶ 16. Plaintiff was shocked to learn of the allegations Jane Roe made against them because they were so far from the truth and their subsequent interactions were positive. Ver. Comp. ¶ 17.

Also in the Fall of 2020, both Plaintiff and Jane Roe, along with other students, sought to join and were pledging the Zeta Delta Xi fraternity (sometimes referred to as "Zete"), which is located in the Marcy House dormitory on Brown's campus. Ver. Comp. ¶ 18. On September 15, 2020, a member of the fraternity contacted Plaintiff to state that "a board in Zete dealing with sensitive cases was made aware of an incident that has happened within Zete last semester" involving Jane Roe, and demanded that Plaintiff provide an immediate response to the fraternity. Ver. Comp. ¶ 18. Plaintiff would not comply with the unauthorized, inappropriate, and harassing demand from the fraternity member and withdrew from pledging the fraternity. Ver. Comp. ¶ 18. Plaintiff has learned that the fraternity conducted meetings, at which Plaintiff was determined to be excluded and banned from the fraternity and from contact with its members. Ver. Comp. ¶ 18.

In January 2021, Brown assigned Plaintiff, a transgender female, housing in a dormitory suite with four male students. Ver. Comp. ¶ 19. Plaintiff is aware of no indication that any of the four male students were interested in gender-inclusive housing. Ver. Comp. ¶ 19. Plaintiff immediately requested a new housing assignment. Ver. Comp. ¶ 19. In response to Plaintiff's

request to change the inappropriate housing assignment, Brown assigned Plaintiff to a room in a different dormitory.  Ver. Comp. ¶ 19.  Prior to the start of freshman year, Plaintiff expressed a preference for and requested gender-inclusive housing, which is a program directed to transgender and non-binary students in particular who may not be comfortable with traditional roommate assignments.  Ver. Comp. ¶ 20.  Brown was fully aware in January 2021 of Plaintiff's gender identity but Brown failed to take it into account in its January 2021 housing assignment. Ver. Comp. ¶ 20.

In connection with Plaintiff's request for a new housing assignment in January 2021, Megan Fox, who held the position of Assistant Director of Student Activities at Brown, stated that she would not have placed a cisgender female student in a dormitory suite with males, but she did place Plaintiff there in that case because Plaintiff is a transgender female.  Ver. Comp. ¶ 21.  As soon as Plaintiff settled into their new dormitory, they were told by Brown that they needed to relocate again, this time it was due to Jane Roe.  Ver. Comp. ¶ 22.  On January 31, 2021, Brown's Title IX Program Officer, Rene Davis ("Ms. Davis"), of the Title IX Office contacted Plaintiff, asserting that there was a "housing conflict" and that Jane Roe was demanding "an immediate housing change as an interim support measure" with respect to the Informal Complaint. Ver. Comp. ¶ 23.

On February 1, 2021, Brown issued a No-Contact Order mutually applicable to Plaintiff and Jane Roe ("First No-Contact Order").  Ver. Comp. ¶ 24.  For example, the First No-Contact Order included the following statement, which applied to both Plaintiff and Jane Roe: "If you are in the same space, you should not stare at the other party, gesture towards them, or look in their direction repeatedly or continuously."  Ver. Comp. ¶ 24.  Receiving notification of the Informal Complaint and the First No-Contact Order, being assigned to an all-male dormitory, having to

relocate to another dormitory, then having Brown demand that Plaintiff change housing again, caused Plaintiff substantial emotional distress and anxiety and was disruptive of their studies. Ver. Comp. ¶ 25.

In an email to Plaintiff dated February 2, 2021, Ms. Davis stated, "I understand from your father that you believe this [Informal Complaint] is a part of ongoing harassment and transphobia by the reporting party.  Ver. Comp. ¶ 26.  This is important context for me to have and address going forward."  Ver. Comp. ¶ 26.  In an email dated February 3, 2021, Plaintiff reiterated to Ms. Davis that Jane Roe's actions were "harassment and manipulation."  Ms. Davis responded, "I take your concerns regarding your fear associated with past and future harassment seriously. . . . I would absolutely factor in alleged harassment on the part of the reporting party as we finalize this decision, especially if that harassment directly relates to the allegations she reported."  Ver. Comp. ¶ 27.  In an email dated February 4, 2021, Ms. Davis further stated, "Again, your references to being harassed are important."  Ver. Comp. ¶ 27.

At no time since February 2021 has Brown taken into consideration, investigated or addressed Jane Roe's harassment of Plaintiff or her manipulation of Brown to facilitate the harassment, despite Ms. Davis's promise to do so.  Ver. Comp. ¶ 28.  Just as Plaintiff was prepared to make the second housing change that the Title IX Office demanded, Ms. Davis informed Plaintiff that they need not change housing, indicating an apparent change of mind by Brown and/or Jane Roe.  Ver. Comp. ¶ 29.  On February 11, 2021, the Title IX Office removed the First No-Contact Order "at the request of the initiator."  Ver. Comp. ¶ 30.  While Plaintiff thought those gestures were a positive sign, Plaintiff learned in September 2021 that it was just another manipulative tactic by Jane Roe designed to harass Plaintiff. Ver. Comp. ¶ 31.

Plaintiff had no contact or communications with the Title IX Office or Jane Roe from February 11, 2021 until September 23, 2021.  Ver. Comp. ¶ 32.  On September 15, 2021, Jane Roe filed a formal Title IX complaint against Plaintiff based on the February 15, 2020 encounter ("Formal Complaint").  Ver. Comp. ¶ 33.  The Formal Complaint includes false and disparaging statements about Plaintiff and the events of the February 15, 2020 encounter.  Ver. Comp. ¶ 34. Plaintiff did not sexually assault Jane Roe as she alleges in the Formal Complaint.  Ver. Comp. ¶ 35.  All sexual contact between them was consensual with each giving express consent.  Ver. Comp. ¶ 35.

Jane Roe filed the Formal Complaint to misuse and manipulate Brown's Title IX procedures, to harass Plaintiff, to inflict emotional distress and other harm on Plaintiff, and to cause Brown and organizations under its purview such as the Zeta Delta Xi Fraternity, Technology House, and other University-sponsored LGBTQ organizations to constructively exclude Plaintiff.  Ver. Comp. ¶ 36.  Jane Roe's motive for her actions toward Plaintiff is clear based on several transphobic comments she made to Plaintiff after the February 15, 2020 encounter.  Ver. Comp. ¶ 37.  Such transphobic comments involved discounting transgender people as valid partners, especially in lesbian relationships, and invoking religious principles to explain why people cannot be transgender or they would be punished in some divine way. Ver. Comp. ¶ 37.

On or about January 24, 2022, Plaintiff asked Brown's Assistant Vice President of Equal Opportunity and Diversity, Juana De Los Santos ("Ms. De Los Santos") to inquire whether Jane Roe would be interested in participating in Brown's informal resolution process.  Ver. Comp. ¶ 38.  Brown's informal resolution process is an alternative means available to resolve the Formal Complaint.  Ver. Comp. ¶ 39.  It is conducted by Brown if both parties agree to participate in it.

Ver. Comp. ¶ 39.  If the matter is resolved by mutual agreement of the parties, the Formal Complaint is considered resolved and closed.  Ver. Comp. ¶ 39.  If the parties are unable to reach an agreement, the formal resolution process is resumed.  Ver. Comp. ¶ 39.  On February 2, 2022, Ms. De Los Santos emailed Plaintiff to inform them that Jane Roe was also interested in pursuing the informal resolution process. Ver. Comp. ¶ 40.

On February 3, 2022, Ms. De Los Santos sent Plaintiff an email with the "Guiding Procedure" for the process.  Ver. Comp. ¶ 41.  Ms. De Los Santos explained that she "will review the proposed terms and will remove those terms that are not permissible under University policy or practice and/or federal or state law" and that she "may consult with relevant University officials, as appropriate, when determining the permissibility of a proposed terms(s)."  Ver. Comp. ¶ 41.  Ms. De Los Santos's email also "reminded that retaliation is prohibited at the University" and defined retaliation as "any action, statement, or behavior meant as reprisal or retribution against an individual in response to the individual's good faith report or participation in a proceeding related to this policy, including the informal resolution process" which "includes, but is not limited to, intimidation, threats, harassment, and other conduct that would discourage a reasonable person from engaging in activity protected under this policy." Ver. Comp. ¶ 42.

Plaintiff participated in the informal resolution process in good faith.  Ver. Comp. ¶ 43. However, the process was not successful because neither Jane Roe nor Brown participated in good faith.  Ver. Comp. ¶ 43.  Jane Roe had no intention of informally resolving the Formal Complaint.  Ver. Comp. ¶ 43.  Instead, Jane Roe saw it as an opportunity to retaliate against Plaintiff and to inflict more harm on Plaintiff.  Ver. Comp. ¶ 43.  The process only caused further harm to Plaintiff and further delayed Brown's investigation of the Formal Complaint.  Ver. Comp. ¶ 43.  Jane Roe's proposed terms and consequences for the informal resolution process

were outrageous and nothing more than a vitriol-filled list of demands intended to further harass Plaintiff.  See Jane Roe's Informal Resolution Proposal, attached as **Exhibit 4**.

When Ms. De Los Santos sent Plaintiff Jane Roe's informal resolution proposal on February 15, 2022, she chose, for unknown reasons, to send the proposal in Jane Roe's own words.  **Exhibit 4**.  Ms. De Los Santos was deliberately indifferent to the fact that Jane Roe was using the informal resolution process to retaliate against and harass Plaintiff.  Ver. Comp. ¶ 45.  Ms. De Los Santos could have and, according to the Guiding Procedure, should have recognized Jane Roe's proposed terms as retaliatory and only conveyed to Plaintiff that an informal resolution would require Plaintiff to leave Brown.  Ver. Comp. ¶ 46.  There was no legitimate reason for Ms. De Los Santos to use Jane Roe's own words to inflict further harm on Plaintiff, and Ms. De Los Santos acted contrary to Brown's own policies and the Guiding Procedure.  Ver. Comp. ¶ 46.  Plaintiff immediately withdrew from the informal resolution process and complained to Ms. De Los Santos about Jane Roe's manipulation of Brown to harass them.  Ver. Comp. ¶ 47.  Jane Roe was manipulating Brown to facilitate her continued harassment of Plaintiff and Brown did so without question or hesitation, which evidences Brown's deliberate indifference toward Jane Roe's gender-based harassment of Plaintiff.  Ver. Comp. ¶ 48.

Turning back to September, 2021, when Brown transmitted the Formal Complaint to Plaintiff, the Title IX Office issued a second No-Contact Order applicable to Plaintiff and Jane Roe ("Second No-Contact Order").  Ver. Comp. ¶ 49.  The Second No-Contact Order was not mutual in its application to Plaintiff and Jane Roe, and in fact, imposed limitations on Plaintiff's behavior that were not equally applicable to Jane Roe.  Ver. Comp. ¶ 49.  For example, the Second No-Contact Order stated, "The following terms apply only to the Respondent. . . . If you are in the same space, you should not stare at the other party, gesture towards them, or look in

11

their direction repeatedly or continuously." Ver. Comp. ¶ 49. The Second No-Contact Order remains in place as of the filing of this action. Ver. Comp. ¶ 49. The one-sided Second No-Contact Order discriminated against Plaintiff for no reason other than to allow Jane Roe's continued harassment of Plaintiff due to their being a transgender female. Ver. Comp. ¶ 50. The First No-Contact Order was mutual and nothing had transpired between Plaintiff and Jane Roe since it was withdrawn to justify a one-sided no-contact order in September 2021. Ver. Comp. ¶ 50.

The Title IX Office commenced its investigation of the Formal Complaint without having considered the circumstances surrounding the Informal Complaint, Jane Roe's manipulative tactics over the prior year, or "any historical documents." Ver. Comp. ¶ 51. For example, Brown initiated the Title IX investigation against Plaintiff in spite of Jane Roe's filing of the Informal Complaint without requesting any action be taken, requesting then withdrawing the First No-Contact Order, demanding Brown relocate Plaintiff to other housing, withdrawing the demand for Brown to relocate Plaintiff, and filing the Formal Complaint nineteen (19) months after the February 15, 2020 encounter. Ver. Comp. ¶ 51. At no time has Brown considered, investigated, or addressed Jane Roe's calculated harassment of Plaintiff, as Ms. Davis promised in connection with the Informal Complaint. Ver. Comp. ¶ 52.

On February 16, 2022, Plaintiff encountered Jane Roe in the hallway of an academic building on campus. Ver. Comp. ¶ 53. Jane Roe stared down Plaintiff as Plaintiff proceeded along the hallway, harassing Plaintiff in person. Ver. Comp. ¶ 53. Jane Roe's conduct would have violated the First No-Contact Order, but was not prohibited by the Second No-Contact Order, which placed restrictions on Plaintiff that were not applicable to Jane Roe. Ver. Comp. ¶ 53. Brown's unending investigation of the Formal Complaint is not only allowing Jane Roe to

12

continually harass and cause irreparable harm to Plaintiff, it is enabling and facilitating Jane Roe to harass Plaintiff.  Ver. Comp. ¶ 54.  Brown has provided no effective support to Plaintiff for Jane Roe's harassment, despite Plaintiff repeatedly and consistently reporting Brown's inadequate student support services to the Title IX Office. Ver. Comp. ¶ 55.

On February 24, 2022, Plaintiff received a message from an officer at Technology House (sometimes referred to as "Tech House"), a dormitory and on-campus organization, where Plaintiff is a member and Projects Manager.  Ver. Comp. ¶ 56.  The message informed Plaintiff that someone from Zeta Delta Xi Fraternity brought to the attention of Technology House that Plaintiff has an ongoing Title IX investigation.  Ver. Comp. ¶ 56.  The message further states that Technology House then met with a Brown dean to discuss the matter and was advised by the dean to ask Plaintiff to step down as Projects Manager until the investigation is concluded.  Ver. Comp. ¶ 56.  Plaintiff's affiliation with Technology House is mostly private as is the Formal Complaint.  Ver. Comp. ¶ 57.  Jane Roe is one of the very few individuals at Brown who should know about both.  Ver. Comp. ¶ 57.  Upon information and belief, Jane Roe disclosed or caused the disclosure to Technology House the ongoing Title IX investigation to further harass Plaintiff. Ver. Comp. ¶ 57.

One of the demands Jane Roe included in her informal resolution proposal was for Plaintiff to "formally withdraw from organized student groups like Tech House, . . ."  **Exhibit 4**. It is no coincidence that Technology House was made aware of the ongoing Title IX investigation just days after Plaintiff rejected Jane Roe's vile informal resolution proposal and withdrew from the informal resolution process.  Ver. Comp. ¶ 59.  On February 24, 2022, Plaintiff sent a letter to Ms. De Los Santos detailing the continued harassment by Jane Roe and demanding that Brown stop same.  Ver. Comp. ¶ 60.  Jane Roe has baselessly and unlawfully

poisoned and interfered with all on-campus social and living groups in which Plaintiff had been involved, including Technology House, in which Plaintiff has had dormitory housing since September 2021, and the Zeta Delta Xi fraternity.  Ver. Comp. ¶ 61.  Jane Roe has caused members of these organizations to shun and exclude Plaintiff and assume that Plaintiff is guilty of an infraction of which they never should have been aware in the first place.  Ver. Comp. ¶ 61. Brown's campus has become a dangerous place for Plaintiff, and Plaintiff does not feel safe living in a Brown dormitory or eating in a Brown dining hall.  On February 26, 2021, Plaintiff vacated their on-campus dormitory and moved to off-campus housing. Ver. Comp. ¶ 61.

Brown has unlawfully discriminated against Plaintiff based on their being a transgender female and has shown a deliberate indifference to Jane Roe's gender-based harassment of Plaintiff.  Ver. Comp. ¶ 62.  For example, Brown assigned Plaintiff to an all-male dormitory in January 2021 with knowledge of Plaintiff's gender-inclusive preference and transgender status, allowed, enabled and facilitated Jane Roe to harass and manipulate Plaintiff by having Brown make demands of Plaintiff and then withdraw those demands, issued the Second No-Contact Order with terms applicable to only against Plaintiff, unduly delayed its investigation of the Formal Complaint for more than five months with no end in sight, and had a dean recommend that Plaintiff step down from their position as Projects Manager at Technology House due to the ongoing (and unending) Title IX investigation. Ver. Comp. ¶ 62.

On September 23, 2021, when Brown transmitted the Formal Complaint and Second No-Contact Order to Plaintiff, the documents were accompanied with a Written Notice of Formal Complaint informing Plaintiff that they are alleged to have engaged in prohibited conduct in violation of the 2019 Title IX Policy and that Brown will use the ***Sexual and Gender-Based Misconduct Complaint Procedure*** ("2021 Non-Title IX Procedure"), attached as **Exhibit 5**, to

resolve the allegations in the Formal Complaint.  Ver. Comp. ¶ 73.  In other words, Brown is looking to the policy in effect at the time of the alleged misconduct to define what conduct was prohibited, but is following the procedure in effect at the time the complaint is filed.

In February 2021, Brown adopted the ***Sexual and Gender-Based Misconduct Policy*** ("2021 Non-Title IX Policy"), attached as **Exhibit 6**, and the 2021 Non-Title IX Procedure in response to the Department of Education's ("DOE") new Title IX rules which went into effect August 14, 2020 ("DOE's 2020 Title IX Rules").  The DOE's 2020 Title IX Rules narrowed the definition of "sexual harassment" and excluded some off-campus sexual and gender-based misconduct from the jurisdictional scope of Title IX.  As a result, colleges and universities nationwide, including Brown, adopted new policies and procedures for classifying and adjudicating sexual and gender-based misconduct that falls outside the purview of Title IX.  Brown also adopted in February 2021 a new Title IX policy, ***Sexual and Gender-Based Harassment, Sexual Assault, Intimate Partner Violence, and Stalking Policy*** ("2021 Title IX Policy"), attached as **Exhibit 7**, and a new Title IX procedure, ***Title IX Grievance Procedure*** ("2021 Title IX Procedure"), attached as **Exhibit 8**, to comply with DOE's 2020 Title IX Rules.

A timeline of events incorporating the dates Brown adopted each of the various policies and procedures may prove helpful when analyzing the facts in this case.

| | |
|---|---|
| Sept. 2016 | Brown last updated 2019 Title IX Policy<br>(this is the charging document for the Formal Complaint) |
| Sept. 2016 | Brown last updated 2019 Title IX Procedure<br>(this procedure allows written statements to be submitted) |
| Pre-Aug. 2019 | Brown updated 2019 Non-Title IX Procedure<br>(this procedure allows written statements to be submitted) |
| Aug. 2019 | Plaintiff matriculates at Brown |
| Feb.  2020 | Plaintiff and Jane Roe engage in sexual contact |

| Aug. 2020 | DOE's 2020 Title IX Rules go into effect |
|-----------|------------------------------------------|
| Feb.  2021 | Brown adopts 2021 Title IX Policy<br>Brown adopts 2021 Title IX Procedure<br>Brown adopts 2021 Non-Title IX Policy<br>Brown adopts 2021 Non-Title IX Procedure*<br>(*this is the procedure Brown insists on using which does not afford students the right to submit a written statement) |
| Sept. 2021 | Jane Roe files Formal Complaint with Title IX Office |

Plaintiff became justifiably confused and concerned about Brown's decision to follow a new procedure that denies them of their contractual right to submit a written statement to the hearing panel in advance of the misconduct hearing.  Ver. Comp. ¶ 76.  Even more concerning was Brown's insistence on following the 2021 Non-Title IX Procedure to adjudicate a Title IX allegation claiming sexual assault that occurred on campus.  Ver. Comp. ¶ 76.  The allegation in the Formal Complaint indisputably falls within the jurisdictional scope of Title IX under either DOE's 2020 Title IX Rules or the older, broader Title IX rules. Ver. Comp. ¶ 76.

On November 2, 2021, Plaintiff sent an email to Ms. De Los Santos raising their concern about Brown's choice of procedure and looking for some answers.  Ver. Comp. ¶ 77.  Plaintiff wrote:

> Dear Juana,
>
> After looking over the Formal Complaint and speaking with my advisor, I have a concern with what appears to be a contradiction between the policy and procedure suggested in the Formal Complaint. The Formal Complaint alleges that I violated the University's Sexual and Gender-based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking **Policy**. I think I understand that. The Formal Complaint goes on to advise me that the University will employ the Sexual and Gender-based Misconduct Complaint **Procedure**.
>
> I have a few questions that I would appreciate answered.

1. When did the Policy referred to in the Formal Complaint become effective, and is that the policy that was in operation at the time of my alleged misconduct?

2. Were there any other misconduct policies, Title IX or otherwise, in effect at the time of the alleged misconduct?

3. When did the Procedure referred to in the Formal Complaint become effective, and is that the procedure that the University would have employed if the complaining student made her complaint at the time of my alleged misconduct?

4. What procedures for investigating/adjudicating misconduct, Title IX or otherwise, did the University employ at the time of the alleged misconduct?

5. Has the University predetermined that the alleged misconduct falls outside of the scope of Title IX? After all, it seems to be suggesting a procedure that is reserved for non-Title IX complaints. If the answer to this question is yes, then please explain why.

6. What mechanism does the University employ that will allow me to dispute what seems to me to be the misapplication of procedure?

Thank you.

On November 5, 2021, Ms. De Los Santos replied as follows:

> The University follows the policy that was in effect at the time of the alleged prohibited conduct. In this case, the policy that was in effect at the time of the alleged incident (i.e. February 2020) was the **Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy** (attached). This is the only policy applicable to this case.
>
> Brown follows the procedures that are in effect at the time the complaint is filed. In this case, that is the <u>Sexual and Gender-based Misconduct Complaint Procedure</u>. This is the only procedure we are following in this case.
>
> As initially noted in this email, based on the date of the alleged offense and the date the complaint was filed, your formal complaint falls under our *former* 2018-2019 policy (attached) and the *current* <u>Sexual and Gender-based Misconduct Complaint Procedure</u>.

On January 24, 2022, Plaintiff attended a meeting with Ms. De Los Santos in which Brown's curious choice of procedure was discussed.  Ver. Comp. ¶ 78.  Plaintiff left the meeting with no better understanding of Brown's rationale for insisting on following a non-Title IX procedure that was not in effect when they matriculated or when the alleged misconduct

17

occurred.  Ver. Comp. ¶ 78.  Ms. De Los Santos attempted to summarize in an email the meeting

for Plaintiff with the following cryptic explanation:

> Per today's meeting, I am memorializing this email in hopes to clarify why
> we are not using the current <u>Title IX Grievance Procedure</u> with the former
> "Title IX" policy (attached).
>
> In our meeting, I mentioned that in May 2020 the Department of Education
> released Title IX regulations. The effective date of those regulations was
> August 14, 2020. Within them, the Department of Education stated that the
> new Title IX policies and procedures (implemented after August 14, 2020)
> would not cover any conduct that took place prior to August 2020. Since
> your alleged misconduct happened in February 2020, the University would
> use the policy that was active during the time of the alleged conduct and the
> *current applicable procedures* at the time in which the formal complaint
> was filed.
>
> In this case, the policy that was active at the time that the alleged misconduct
> occured [sic] (February 2020) was the **Sexual and Gender-Based
> Harassment, Sexual Violence, Relationship and Interpersonal Violence
> and Stalking Policy** (i.e. former "Title IX" policy - attached). The current
> applicable procedure is the <u>Sexual and Gender-based Misconduct
> Complaint Procedure</u>, because your alleged misconduct happened *prior* to
> the new Title IX procedures being implemented in August 2020. As such,
> your case was designated with the appropriate policy and procedures.
>
> I know this can be a bit confusing, but if you have any further questions
> please let me know. Your advisor is also welcome to reach out to our Office
> of General Counsel to discuss this matter further.

Ver. Comp. ¶ 78.

Brown's arbitrary and capricious decision to follow the procedure in effect at the time the

complaint is filed wholly ignores that the accused student may have a reasonable expectation

under contract law as to specific promises Brown made to them in its student misconduct

procedures.  Ver. Comp. ¶ 79.  Here, Brown promised to afford Plaintiff the right to submit a

written statement to a hearing panel in advance of a student misconduct hearing.  Ver. Comp. ¶

79.  The promise was expressly contained in the 2019 Title IX Procedure and the 2019 Non-Title IX Procedure.  **Exhibit 2**, § VIII.A.8; **Exhibit 3**, p. 8.

Brown's refusal to afford Plaintiff this contractual right constitutes a breach of contract.  Brown's only explanation for its position is that it has decided to adopt a policy of following the procedure in effect at the time the complaint is filed.  This is not an explanation.  Instead, it is the equivalent of a parent telling their young child "because I said so."  The difference is that Plaintiff is an adult, tuition-paying student, with contractual rights – not a child.  Brown cannot be permitted to unilaterally and arbitrarily withhold a contractual right it promised to Plaintiff.

Brown is also ignoring the language in its own procedures to reach the result it wants to achieve.  The 2021 Non-Title IX Procedure that Brown insists on following to adjudicate whether Plaintiff violated the 2019 Title IX Policy in February 2020 explicitly states that it does not apply to such matters.  The 2021 Non-Title IX Procedure states:

> Exempt from these procedures is Prohibited Conduct defined in the Sexual and Gender-Based Harassment, Sexual Assault, Interpersonal Violence, and Stalking Policy [the 2021 Title IX Policy].

**Exhibit 5**, § 2.0.  If the 2021 Non-Title IX Procedure is not to be used to adjudicate conduct prohibited by the 2021 Title IX Policy, it cannot be used to adjudicate conduct prohibited by the 2019 Title IX Policy.  In other words, even if this Court were to find that Brown's decision to follow the procedure in effect at the time the complaint is filed does not offend Plaintiff's contractual rights, Brown must follow the procedure in effect at that time ***for adjudicating Title IX violations*** because the Formal Complaint alleges a sexual assault that occurred on campus which falls squarely within the jurisdictional scope of Title IX under either DOE's 2020 Title IX Rules or the older and broader Title IX rules.

Brown is choosing to look to a Title IX policy for definitions of prohibited conduct, but follow a non-Title IX procedure to investigate and adjudicate the same matter.  Plaintiff can only deduce from Brown's insistence on following a non-Title IX procedure that Brown does not deem the allegations in the Formal Complaint to fall under Title IX.  Brown has avoided answering this question thus far, however, the Formal Complaint alleges conduct that is only prohibited by Brown's Title IX policies (i.e., sexual assault occurring on campus).

If Brown deems the Formal Complaint to be outside the scope of Title IX, then the only reason Brown would take the position that the 2019 Title IX Policy governs the alleged conduct is that no other policy in effect at the time of the February 15, 2020 encounter prohibited the conduct alleged.  Brown is arbitrarily cherry-picking the policies and procedures it wants to use to reach the result it wants to achieve.  It wants to use a Title IX policy (to have a policy that prohibits the alleged conduct) and a non-Title IX procedure (to restrict the rights available to the respondent/accused) for the same Title IX complaint.  Brown's refusal to afford Plaintiff their contractual right to submit a written statement to the hearing panel in advance of the hearing is at best arbitrary and capricious and at worst a breach of contract and sex/gender-based discrimination designed to favor the complaining students, who are predominantly female.[4]

Plaintiff appreciates that Brown did not expressly promise to complete the investigation and disciplinary process of all Title IX complaints within 60 days.  Ver. Comp. ¶ 72.  However, Plaintiff reasonably expected, based on Brown's promise for a prompt investigation and its own estimated time frame of 60 days to complete the entire process, that under no circumstances would Brown be in the midst of its investigation with no end in sight more than 150 days after

---

[4]  Whether DOE's 2020 Title IX Rules apply prospectively or retroactively to this matter need not be determined here, but it is worth noting these rules provide that a school's "treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title ix."  34 C.F.R. § 106.45(a).

the Formal Complaint was filed.  Ver. Comp. ¶ 72.  Brown's investigation of the Formal

Complaint has been anything but prompt.

Brown's procedures for conducting Title IX and other student misconduct investigations

impose strict deadlines and limitations on requests for extensions of time by respondents, but not

for Brown.  Ms. De Los Santos provided the following statement to Plaintiff in an email dated

September 27, 2021:

> Extensions.   A Complainant and/or Respondent may ask for an extension
> to a deadline or to pause the investigation.  Pauses and/or extension are only
> provided for good cause and are normally a three- to five-day extension.
> Good cause is considered to be extraordinary or extenuating circumstances
> outside of the control of the party such as an unanticipated health issue or
> exam or deadline associated with an academic assignment. . . . .

Ver. Comp. ¶ 89.

No complex or unique factors exist in this case to justify Brown's failure to have

conducted its Title IX investigation of the Formal Complaint promptly and without undue delay.

The investigation is still in the early stages, and Brown has already taken more than 150%

additional time than it estimated to compete the entire disciplinary process.  Brown has not

provided any justification to Plaintiff for such a lengthy and unreasonable delay.  Simply put,

there is no justification for the undue delay.

On September 27, 2021, the Title IX Office informed Plaintiff that a third-party

investigator ("Investigator") had been appointed to investigate the Formal Complaint.  Ver.

Comp. ¶ 90.  On or about November 11, 2021, the Investigator contacted Plaintiff for the first

time, seeking to set up an interview "to gather more information."  Ver. Comp. ¶ 91.  The

Investigator met with Plaintiff to conduct the requested interview on November 30, 2021.  Ver.

Comp. ¶ 91.  In an email to Ms. De Los Santos dated February 15, 2022, Plaintiff asked for "a

reliable timeline for whatever remains to bring this matter to a conclusion."  Ver. Comp. ¶ 92.

Plaintiff did not receive an answer to this question. Ver. Comp. ¶ 92.

In an email dated February 21, 2022, the Investigator informed Plaintiff, through their

attorney, that "I am currently interviewing witnesses.  I anticipate that I will reach back out to the

parties to schedule final interviews in the next couple of weeks."  Ver. Comp. ¶ 93.  Separate

from the 2019 Title IX Procedure, Section 2.9.5 of the 2021 Title IX Procedure approximates the

time associated with the major stages of the process as follows:

- Investigation – Thirty (30) business days
- Draft Report Review – Ten (10) business days from delivery of the draft report
- Finalize the Investigation Report – Five (5) business days
- Hearing Panel Report Review – Ten (10) business days
- Hearing Panel Deliberation – Five (5) business days
- Right of Appeal – Five (5) business days from the delivery of the written outcome

Even if Brown were to promptly complete its investigation and the remainder of the disciplinary

process from this point forward according to the time frame set forth in the 2021 Title IX

Procedure, that would result in the hearing being scheduled during Plaintiff's final exams in

early May.  Ver. Comp. ¶ 95.  Unless this Court grants the requested relief, Plaintiff will be

further denied their right to a fair and prompt hearing and denied their contractual right to submit

a written statement to the hearing panel in advance of the hearing, which will cause them

irreparable harm.

## ARGUMENT

### I.     Legal Standard for Preliminary Injunction.

A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."  *Voice of the*

*Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1ˢᵗ Cir. 2011) (quoting

*Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 21 (2008)).

## II.     Plaintiff Has Established a Likelihood of Success on the Merits.

"Under Rhode Island law, '[a] student's relationship to his university is based in

contract.'"  *Doe v. Brown University*, 166 F. Supp. 3d 177, 191 (D.R.I. 2016) (quoting *Havlik v.*

*Johnson & Wales Univ.*, 509 F.3d 25, 34 (1ˢᵗ Cir. 2007)).  "In considering whether the contract

was breached, courts look to see if a university has failed to meet the standard of reasonable

expectations, measured by what meaning the university should reasonably expect the other party

to have given terms in its contract."  *Doe v. Harvard University*, 462 F. Supp. 3d 51, 65 (D.

Mass. 2020) (internal citations omitted).  "Accordingly, 'if the university explicitly promises an

appeal process in disciplinary matters, that process must be carried out in line with the student's

reasonable expectations.'"  *Doe v. Brown University*, 166 F. Supp. 3d at 191.  "Whether an

expectation is reasonable often hinges on the specificity of the promises in the handbook: courts

may not read terms into the contract."  *Id.* at 191.  "Any '[a]mbiguities in a contract must be

construed against the drafter of the document,' which in the case of a student is the university.'"

*Doe v. Brown University*, 210 F. Supp. 3d 310, 330 (D.R.I. 2016) (internal citation omitted).  To

the extent this Court finds any ambiguity in the operative contract, such ambiguity must be

construed against Brown and in favor of Plaintiff.

In *Stiles v. Brown University*, this Court recently held in a student's breach of contract

action against Brown that "[t]he operative contract is Brown's Student Conduct Procedure and

Sexual Misconduct Procedure."  Jan. 25, 2022 Order, USDJ McMElroy, C.A. No. 1:21-cv-

00497-MSM-LDA, ECF No. 30 p. 4.  Here, the 2019 Title IX Procedure is the operative contract

for Plaintiff's claim against Brown.

In *Doe v. Brown University*, this Court held Brown to a specific promise similar to the promise at issue in this case:

> The "General Provisions for the Student Conduct Procedures" of the Code states that "the case administrator <u>will respond</u> to requests from respondents and complaining witnesses during the prehearing phases of the student conduct procedures." (Ex. A to Compl. at 10, 16, ECF No. 1-1 (emphasis added).)  The Court finds that, taken as true, these allegations state a breach of the Code.  Brown chose to write its policy to state that the case administrator "will respond" to the respondent's requests; now it must live with that promise.

166 F. Supp. 3d at 194.  Here, Brown is denying Plaintiff specific rights it promised them in the event they became the subject of a student misconduct complaint.  This Court should order Brown to abide by and honor those promises made to Plaintiff.

The 2019 Title IX Procedure states that Brown "ordinarily will seek to complete its investigation and disciplinary process, if any, within sixty (60) days. . . . The University's overarching goal is that all Complaints be investigated in a prompt, fair, and impartial manner." **Exhibit 2**, § X.  The Formal Complaint was filed more than five (5) months ago and the matter is still in the investigation phase with no end in sight.  There has been nothing prompt about Brown's handling of the process despite its promise to complete its investigation and disciplinary process in a prompt manner.  The 2019 Title IX Procedure also promised Plaintiff that they would have the right to submit a written statement to a hearing panel if they became the subject of a Title IX complaint.  **Exhibit 2**, § VIII.A.8.

Plaintiff was provided a copy of the 2019 Title IX Procedure during a sexual assault prevention program during orientation and had to acknowledge receipt of the procedures.  Ver. Comp. ¶ 67.  Plaintiff had a reasonable expectation of the rights to which Brown promised to afford them, including the right to a fair and prompt investigation and hearing process and the right to submit a written statement to a hearing panel if they became the subject of a Title IX

complaint, or the subject of any other student misconduct complaint so long as the discipline to be imposed could result in separation from Brown.  Ver. Comp. ¶ 68.  The 2019 Title IX Procedure is the operative contract between Plaintiff and Brown as to how Title IX formal complaints made against Plaintiff while a student at Brown must be investigated, heard and decided, including the time frame within which all of it is completed.

After this Court denied Brown's motion to dismiss in *Doe v. Brown University* in 2016, Brown revised its Student Conduct Procedures to limit the promises it was making to its students.  However, Brown kept the specific promise that students may submit a written statement.  The Student Conduct Procedures in effect in *Doe v. Brown University* were:

> Students and student organizations charged with offenses against the Code of Student Conduct are afforded the following rights in University proceedings:
> ....
> To be given <u>every opportunity</u> to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer. (Students have the right to prepare a written statement in matters that may result in separation from the University.) (emphasis added).)

> Without question, Doe was not—according to his allegations—given "every opportunity" to participate in the disciplinary process. Once again, Brown chose to draft its Code to give students the right to "every opportunity" to "articulate relevant concerns" and "offer evidence"; now it must abide by that decision.

*Id*. at 195.  Brown subsequently revised that procedure.  The 2019 Non-Title IX Procedure now states in pertinent part:

> F.  To be given <u>an opportunity</u> to articulate relevant concerns and issues, express salient points, and offer evidence before the hearing officer(s). (Students have the right to prepare a written statement in matters that may result in separation from the University.)

**Exhibit 3**, p. 8 (emphasis added).  The right to submit a written statement was maintained when it survived Brown's revisions and, therefore, was promised to Plaintiff in 2019.

"In addition, universities still must meet a standard of basic fairness for its contractual dealings with students and may not 'arbitrarily or capriciously dismiss a student.'" *Doe v. Harvard University*, 462 F. Supp. 3d at 65 (quoting *Coveney v. President & Trs. of Coll. of Holy Cross*, 445 N.E.2d 136 (Mass. 1983)). Brown's specious decision to insist on following the procedure that denies Plaintiff the right to submit a written statement is arbitrary and capricious and violates fundamental fairness. This is especially true where, as here, the procedure by its own terms states that it is inapplicable for the very purpose Brown insists on using it. **Exhibit 5**, § 2.0. Therefore, Plaintiff has established a substantial likelihood of success on the merits of their claim that Brown has breached its contract with Plaintiff and violated fundamental fairness.

**III.      Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief.**

Plaintiff has only one opportunity to defend themself from the allegations in the Formal Complaint. If Plaintiff is wrongfully adjudicated to be responsible because they were denied their contractual right to a fair opportunity to present their defense through a written statement and forced to verbally summarize the evidence and present their defense in seven minutes, the harm will be irreparable. There is no right to a *de novo* appeal or judicial review. The hearing panel's determination can only be appealed on very limited grounds. **Exhibit 2**, § VIII.D.; **Exhibit 8**, § 2.9.4.9.

Having the ability to submit a written statement in lieu of making a verbal presentation to the hearing panel may not make much difference to every student defending against a Title IX complaint. It is everything, however, to Plaintiff. In addition to the obvious reasons someone would prefer to submit a written statement, such as overcoming the anxiety of the moment, managing the pressure of making a good impression while clearly articulating the points to be made, and keeping within the allotted time, Plaintiff has the added hurdle of being a transgender

26

female.  Plaintiff's presentation does not comport with the traditional image of a female.

Plaintiff's appearance and voice causes people to immediately categorize them as "different" or

worse.  Transgender people face social prejudices that others do not.  Plaintiff wants the

substance of their statement to be received by the hearing panel as objectively and impartially as

possible and with as little chance of social prejudices or stigmas creeping into the hearing

process.  If Plaintiff did not have a contractual right to submit a written statement, they might

have had to accept the process that Brown is insisting upon.  But, Plaintiff has a contractual right

to submit a written statement and forcing them to defend against the Formal Complaint without

that right will cause irreparable harm for just having to go through the process in that manner.

Brown has no legitimate excuse for failing to complete its investigation of the Formal

Complaint in the Fall Semester of 2021 and continues to unduly delay completion of its

unending investigation.  Brown's inexcusable failure to timely complete the Title IX

investigation against Plaintiff has allowed Jane Roe to continue to harass Plaintiff, including with

respect to the incident involving Technology House beginning on February 23, 2022, thereby

denying Plaintiff the benefits of Brown's educational programs and activities.  Ver. Comp. ¶ 97.

Brown's delay in conducting its Title IX investigation of the Formal Complaint and Brown's

treatment of Plaintiff in response to the Formal Complaint is also causing substantial, ongoing,

and increasing emotional distress and anxiety to Plaintiff and is increasingly disruptive of

Plaintiff's studies.  Ver. Comp. ¶ 98.

As evidence of the concrete harm caused by Jane Roe's discriminatory harassment and

Brown's deliberate indifference to the harassment, Plaintiff was forced to move to an off-campus

apartment on February 26, 2022 because they no longer feel safe living on Brown's campus.

Ver. Comp. ¶ 99.  If Brown had promptly completed its investigation of the Formal Complaint in

the Fall of 2021, Jane Roe would no longer be armed with the fact that Plaintiff is the subject of an ongoing Title IX investigation in March 2022. Ver. Comp. ¶ 99.

Brown will undoubtedly argue that this lawsuit and motion are premature and that Plaintiff cannot establish irreparable harm without having the matter first adjudicated by the hearing panel under the formal resolution process.  That argument is unavailing for three reasons.  First, Plaintiff should not be forced to defend themself at a hearing without their right to submit a written statement simply because Brown will contend that if Plaintiff is found responsible by the hearing panel they can then seek to litigate this issue in court and, if successful, defend the case all over again at a second hearing.  Having to defend against the Formal Complaint at two separate hearings constitutes irreparable harm in and of itself.  Plaintiff should not be subjected to making a seven-minute verbal presentation in their defense when Brown promised and is contractually bound to allow Plaintiff the right to submit a written statement.  Second, even if Plaintiff were to successfully litigate this issue after being found responsible by the hearing panel under the 2021 Non-Title IX Procedure, there is a real risk that (i) the second hearing panel learns of the prior finding and is unfairly influenced in its decision making, and/or (ii) the hearing panel's decision is leaked to third-parties by Jane Roe or someone else.  Third, Plaintiff does not wish to risk waiving their right to seek redress in this Court by voluntarily submitting to a hearing process that clearly deprives them of their contractual rights.  Therefore, Plaintiff will be irreparably harmed unless this Court grants the requested injunctive relief.

## IV.    The Hardship Plaintiff Will Suffer Without an Injunction Far Outweighs Any Hardship to Brown If an Injunction is Granted.

If this Court grants a preliminary injunction mandating that Plaintiff be afforded the right to a fair and prompt hearing and to submit a written statement to the hearing panel in advance of the hearing, Brown will suffer no hardship.  After all, the Court would only be ordering precisely

what Brown promised Plaintiff in the first place.  On the other hand, if this Court declines to

grant the injunction, Plaintiff will suffer a substantial hardship by having to defend themself at

the hearing by making a verbal presentation in only seven minutes.  Brown has arbitrarily

selected to impose a one-size-fits-all seven-minute time limitation on verbal statements made at

student misconduct hearings.  Regardless of the severity of the allegations, the number of

charges brought, the number of witnesses to testify, the volume of exhibits submitted, the

complexity of the fact pattern, or the defenses to be raised, Brown has made clear that verbal

statements will not be allowed to exceed seven minutes.  The 2021 Non-Title IX Procedure states

that "[t]he Chair will intervene should a verbal statement exceed seven (7) minutes."  **Exhibit 5**,

§ 2.9.4.  Any hardship Brown might perceive by the Court's granting an injunction is speculative

and far outweighed by the concrete injury Plaintiff will suffer if the Court does not grant an

injunction.

**V.      The Public Interest Will be Served by the Granting of Injunctive Relief.**

The public has an interest in colleges and universities, including Brown, investigating and

adjudicating sexual and gender-based misconduct allegations fairly, promptly and in accordance

with those contractual rights promised to their students.  The public interest would best be served

in this case by the Court's granting an injunction so that the Plaintiff can defend themself fairly

by submitting a written statement and not having to verbally state their defense in seven minutes.

Whereas, denying the requested injunctive relief would serve no public interest at all.

## <u>CONCLUSION</u>

For the reasons set forth in detail above, this Court should issue a temporary restraining

order and mandatory injunction ordering Brown to cease its investigation and take no

disciplinary action against Plaintiff in connection with the Formal Complaint and/or the February

15, 2020 encounter or, in the alternative, to (i) complete its investigation of the Formal

Complaint promptly and without further undue delay, (ii) schedule Plaintiff's student misconduct

hearing promptly upon completion of the investigation, (iii) follow the 2019 Title IX Procedure

for the student misconduct hearing which affords Plaintiff the right to submit a written statement

to the hearing panel in advance of the hearing, and (iv) not discriminate or retaliate against

Plaintiff based on being a transgender person or for pursuing their rights in this action.

<div style="margin-left: 40%;">

LOIS LANE,
Plaintiff,
By their Attorneys,


/s/ Stephen J. Brouillard
Stephen J. Brouillard, Esq. #6284
Bianchi Brouillard Sousa & O'Connell, P.C.
56 Pine Street, Suite 250
Providence, RI 02903
(401) 223-2990 *telephone*
(877) 548-4539 *facsimile*
sbrouillard@bbsolaw.com

and


/s/ John R. Grasso
John R. Grasso, Esq. #7495
Law Office of John R. Grasso, Inc.
72 Clifford Street, 3rd Floor
Providence, RI 02903
(401) 272-4001 *telephone/facsimile*
jrg@grassolaw.com

</div>

Dated: March 2, 2022